*Circuit Court of Cook County. In Chancery.*

## The Buda Foundry & Manufacturing Company, et al.

### vs.

## Columbian Celebration Company, et al.

(August 6, 1903.)

1. CAPITAL STOCK—TRUST FUND FOR CREDITORS. The capital stock of a corporation is a trust fund for its creditors. This trust fund consists of the capital paid in and that which the creditor has promised to pay in.

2. SAME—DEVICE TO AVOID STOCK LIABILITY. Any device between stockholders, or between stockholders and the corporation, by which the stockholders' liability to the creditors is sought to be avoided, is against public policy and void, even though the transaction may be binding as between themselves.

---

[1] For the decision on the motion to direct a verdict, see *People v. Loeffler*, 1 Ill. C. C. 381, *supra*.—Ed.

3. SUBSCRIPTION TAKEN IN PROPERTY—OVERVALUATION—HONEST MISTAKE, ETC. A subscription to stock may be paid in property but there must be an honest attempt to arrive at the actual value of the property. If the property is fraudulently overvalued, such overvaluation will be held void as a matter of law, although an honest mistake as to such value will not invalidate the transaction.

4. SAME—EFFECT OF OVERVALUATION—HOW STOCK MUST BE PAID FOR. If the property contributed in payment of a subscription is not valued in good faith, or if there is an intentional overvaluation by the directors, or if the property is entirely worthless, the stock will be considered as not fully paid. As against creditors the stock must be paid for in "money or money's worth."

5. SAME—PAYMENT OF SUBSCRIPTION IN PROPERTY—GOOD FAITH OF DIRECTORS. To constitute a valid payment of a stock subscription by the transfer of property, there must be good faith on the part of the directors. The law does not require infallible judgment, but where the evidence shows an intentional overvaluation or any device to obtain possession of the stock without fully paying for it, the transaction will be deemed fraudulent in law and in fact.

6. SAME—CRUDE AND UNDEVELOPED INVENTIONS AS PAYMENT FOR STOCK SUBSCRIPTIONS. Where the evidence shows that an inventor and organizer of a corporation turned over to the corporation in full payment for his subscription of $2,000,000, certain crude and undeveloped inventions which had never been in use and had no known value, and the board of directors was controlled by such inventor, and it was not shown that any of said board honestly believed that the inventions were worth the amount of said subscription and there was no honest discussion or inquiry as to the value of such inventions, it was held that the scheme was a fraudulent one and the stock could not be considered as paid up.

7. SAME—ENTIRE STOCK OF CORPORATION ISSUED IN EXCHANGE FOR CERTAIN INVENTIONS—WHETHER PAID FOR. Where the entire capital stock of a corporation is issued in exchange for certain inventions to be used in a certain amusement enterprise, and the company possessed no land, or site for the projected building, and it had no means of obtaining any money, except from its subscriptions, these facts must be taken into consideration in determining the good faith of the transaction.

8. SAME—VALUE OF PROPERTY—FUTURE PROFITS—SPECULATIVE VALUES. Property taken in payment of stock subscription must be capable of pecuniary estimate. A guess or an estimate as to

the value of a right to use certain crude and undeveloped inventions, based entirely on speculative profits from the future use of such inventions cannot be considered as determining the value of such inventions.

9. SAME—ARRANGEMENT BETWEEN STOCKHOLDERS AS TO PAYMENT OF SUBSCRIPTIONS. Any arrangement between stockholders by which the stock is but nominally paid up, the corporation not in fact getting the benefit of the price in good faith, will be regarded as a sham and not as a valid payment, as against the creditors of the corporation.

10. SAME—FRAUDULENT PAYMENT OF SUBSCRIPTION. Where certain inventions are turned over to a corporation in payment of a subscription to its stock and a large part of such stock is turned back into the treasury of the corporation to be used for promotional purposes, such transaction will be considered as fraudulent both in law and in fact.

11. PAROL EVIDENCE—ADMISSIBLE TO SHOW WHAT AGREEMENT REFERRED TO. Where a subscriber for the bonds of a certain corporation is entitled to certain shares of stock as a bonus and no particular shares of stock are designated, parol evidence is admissible to show what particular stock is referred to.

12. STOCK SUBSCRIPTITON—EFFECT OF ISSUANCE OF STOCK AS FULLY PAID—RECITAL IN CERTIFICATE. The mere fact the stock was issued as fully paid does not make it so in fact. The subscribers cannot safely rely upon the recital on the face of the certificate that the stock is fully paid and make no further inquiry.

13. CERTIFICATE OF STOCK—RECEIPT OF—IMPLIED PROMISE TO PAY THEREFOR. A promise to take a share of stock imports a promise to pay for it, even though the certificate is stamped "non-assessable."

14. SUBSCRIPTION FOR BONDS AND STOCKS—APPLICATION OF PAYMENTS—STOCK LIABILITY. Where defendants subscribe for bonds of a corporation and receive certain shares of the capital stock of the corporation as a bonus, and an action is instituted to enforce a liability on such stock to the creditors of the corporation, a court of equity will not treat the money paid under the subscription agreement as paid upon the stock, as against the claim of creditors becoming such with knowledge that the stock was unpaid.

15. STOCK SUBSCRIPTION—BONA FIDE PURCHASERS—BONUS STOCK. Where certain persons subscribed for the bonds of a corporation and received certain shares of its stock as a bonus, to be delivered upon payment for the bonds, such subscribers were put upon inquiry as to the character of the stock and the

right of the corporation to dispose of it at less than par. If no inquiry was made, the law holds such stockholders chargeable with that knowledge which a reasonable inquiry would have disclosed.

16. SAME—WHETHER STOCK TRANSFERRED BY CORPORATION IS A BONUS or GIFT, OR A SALE. The defendants subscribed for certain corporate bonds and received with such subscription certain stock of the corporation as a gift or bonus. The stock in question had been previously subscribed for and supposedly paid for by the transfer to the corporation of certain inventions of doubtful value, and thereafter such stock was turned back into the treasury of the corporation for the purpose of re-issuing the same to the subscribers for the bonds. *Held* that inasmuch as the stock was turned back to the corporation without anything being paid for it, it stood in the same position as if it was never issued and upon its re-issuance to the subscribers for the bonds, such subscribers cannot be treated as assignees but must be treated as original subscribers and held liable as such.

17. SUBSCRIPTION AGREEMENT—REQUISITES OF. No particular form of words is necessary to constitute an agreement to become a stockholder. If the contract amounts to an agreement to take from the company its stock that is sufficient.

18. STOCKHOLDERS—CHARGEABLE WITH NOTICE THAT STOCK MUST BE PAID FOR. Subscribers to the capital stock of a corporation are presumed to know that the corporation could not legally issue fully paid stock to any one agreeing to become a stockholder, without the same being paid for in money or in money's worth.

19. LIABILITY OF STOCKHOLDERS—STOCK RECEIVED AS BONUS WITH PURCHASE OF BONDS—EFFECT OF REFUSAL TO ACCEPT. Certain persons agreed to take and pay for certain bonds of a corporation. The subscription agreement provided that upon full payment being made the subscriber should be entitled to receive certain shares of stock as a bonus. After signing the subscription agreement and paying for the bonds, certain of the subscribers neglected or refused to accept the stock. *Held* that the true construction of the agreement was that upon the payment for the bonds the subscriber *eo instanti* became entitled to the stock, and thereupon the liability of such subscribers became fixed as stockholders and they could not rescind such agreement in whole or in part, as against the creditors of the corporation.

20. SAME—EFFECT OF REFUSAL TO ACCEPT STOCK OR BONDS. The same measure of liability attaches to such of the subscribers of bonds who either refused or neglected to take either stock or bonds. Having paid for the bonds and not having exercised

26

any right to rescind the subscription agreement their liability to creditors became fixed and determined.

21. SUBSCRIPTION AGREEMENT—RIGHT TO RESCIND. Upon the execution of a subscription agreement, the liability of a subscriber to the creditors immediately attaches, and such subscriber cannot escape liability by a rescission of the contract.

22. STOCKHOLDERS' LIABILITY—PURCHASERS FOR VALUE—LIABILITY OF. EFFECT OF NOTICE. A purchaser or assignee of stock which has not been fully paid is not liable to corporate creditors, where the stock has been issued as fully paid and he has acquired the same in good faith and without notice that it has not been fully paid. But if he has notice that it is not fully paid he is liable.

23. STOCKHOLDER'S LIABILITY—EXTENT OF KNOWLEDGE THAT STOCK WAS NOT PAID UP. Where the subscribers to bonds of a corporation receive an equal amount of the shares of stock of the corporation as a bonus and at the time of the making of the subscription they are informed that the capital stock has been paid up by the transfer to the corporation of certain inventions and patents, and such inventions and patents are of uncertain and doubtful value and such subscribers blinded by the promise of large dividends rely upon the statements of the officers of the corporation as to the value of the inventions, etc., and make no independent inquiry, they are chargeable with knowledge that such stock is not paid up, and cannot be considered as purchasers for value.

24. SAME—BELIEF OF SUBSCRIBER THAT STOCK IS PAID UP—EFFECT OF. The fact that the subscribers honestly believed that the capital stock was fully paid for is no defense to an action to enforce a stock liability. In order that such belief should be available as a defense it must be based upon a statement of facts which the purchasers believed to be true and which facts if true, would constitute a sufficient payment of such stock. A mere statement either of fact or law by a third person is not in itself a sufficient foundation for a belief, which the law will recognize as relieving such person from liability, but the facts from which such conclusion is arrived at must be considered.

25. SAME—GOOD FAITH OF SUBSCRIBER—EFFECT OF BELIEF IN SUCCESS OF ENTERPRISE. It is not a defense to an action to enforce a stock liability that the subscriber acted in good faith in signing the subscription agreement, or that he believed that the enterprise would be a success.

26. STOCK SUBSCRIPTION—PAYMENT IN MONEY'S WORTH—RULE IN ILLINOIS. The courts of Illinois have not departed from the rule that a payment of a stock subscription is not good as against creditors where payment has not been made in money or

money's worth. Stock may be paid for in property but such property must be valued in entire good faith. If there is an overvaluation combined with a failure to exercise any judgment as to the value of the property, or where there is an intentional overvaluation or where the circumstances show that the transaction·was a mere fraudulent device, the stock will not be considered as full paid.

27. SAME—LIABILITY OF ASSIGNEE—EFFECT OF NOTICE. The purchaser of stock issued as "paid up" with notice that it is not paid up, or with notice of facts connected therewith, is liable to the creditor to the same extent as his immediate transferror.

28. SAME—WHEN STOCKHOLDERS ARE BONA FIDE PURCHASERS—WHAT KNOWLEDGE IMPUTED TO THEM. Persons purchasing the bonds of a corporation·and receiving its stock as a bonus are not permitted to deal with the corporation with their eyes shut. As bond holders they are chargeable with notice of the contents of the mortgage and with the provisions of any contracts referred to therein, and as stockholders they must take notice of the amount of the capital stock, the contents of the charter, as well as the law of the land governing such corporations. Where the circumstances are sufficient to put a reasonably prudent and cautious man upon inquiry as to the good faith of the transaction by which the stock of the corporation is paid up, such subscribers cannot be considered as innocent holders.

29. SUBSCRIPTION TO STOCK—EVIDENCE OF. Evidence examined and held sufficient to show that certain defendants were liable as subscribers to the capital stock, even though it was not shown that they actually signed the subscription agreement.

30. LIABILITY OF STOCKHOLDERS—ENFORCEMENT AGAINST ESTATE—PERSONAL REPRESENTATIVES NOT MADE PARTIES. Where an action is instituted to enforce a stockholder's liability, and such stockholder dies during the pendency of the suit, no decree can be rendered against his estate, where his personal representatives have not been made parties.

31. LIABILITY OF STOCKHOLDERS—BURDEN OF PROOF. Where complainants in an action to enforce stockholder's liability, show that certain stock which had been transferred to one of the defendants was unpaid stock, the burden of proof is upon such defendant to show that he is a purchaser for value.

32. CREDITOR'S AND STOCKHOLDER'S BILLS—JUDGMENT AND CONTRACT CREDITORS—RIGHTS OF. A judgment creditor has a standing in equity to pursue all the property of his debtor and can equitably attach all rights and credits of his debtor. A simple contract creditor has no such standing in a court of equity and

can only file a bill to enforce stockholder's liability by virtue of section 25 of the general incorporation act.

33. STATUTE OF LIMITATIONS—IN ACTION TO ENFORCE STOCKHOLDER'S LIABILITY—WHEN A BAR. A bill was filed to enforce stockholders' liability and a demurrer was sustained thereto and the bill dismissed. Upon appeal the judgment was reversed. The defendant was not notified of the redocketing of the case within five years as required by law. *Held* that the statute of limitations was a bar to the action.

34. SAME—ESTATE OF DECEASED STOCKHOLDERS. Where an action is brought to enforce a stockholder's liability and certain stockholders decease during the pendency of the suit, and the suit is not revived by bringing in the executors or administrators of such deceased stockholders within two years from the date of the issuance of the letters, the only decree that can be made against any executor or administrator is that the same be paid out of assets discovered or inventoried after the expiration of said two years.

35. STOCK AND STOCKHOLDERS—LIABILITY OF TRUSTEE. Where certain shares of stock are deposited with a bank as trustee to deliver the same to the subscribers for bonds of the corporation as a bonus, and such bank merely acts as a conduit through which the corporation transfers said stock to the bondholders, such bank is not liable as a stockholder within the meaning of section 25 of the General Incorporation Act of Illinois.

36. ENFORCEMENT OF STOCKHOLDER'S LIABILITY—RIGHT TO SET OFF CLAIMS AS BONDHOLDERS. Where certain defendants subscribe for the bonds of a corporation and receive stock of the corporation as a bonus, and an action is instituted to enforce a stockholder's liability with respect to such bonus stock, it was *held* that the defendants were not entitled to set off the amount of their liability on the stock against any claim they may have on the bonds. They must first pay for their stock and file their claim on the bonds.

37. BONDHOLDERS—RIGHT TO SHARE EQUALLY WITH OTHER CREDITORS—APPLICATION OF MAXIM "HE THAT DOETH INIQUITY SHALL NOT HAVE EQUITY." Bondholders of an insolvent corporation who were also stockholders, but received their stock as a bonus with their subscription for bonds, are entitled to share equally with other creditors in the distribution of the corporate assets, even though they originally paid nothing for their stock. Although the transaction by which they received their stock as a bonus was fraudulent in law, there being no actual fraud, such stockholders cannot be considered as not coming into court "with clean hands."

Bill to enforce stockholders' liability.   Circuit court Gen. No. 116,462.   Heard upon exceptions to master's report before Judge Murray F. Tuley.

The facts are stated in the opinion.

*Scott, Bancroft, Lord & Stephens, Herrick, Allen, Boyesen & Martin, E. R. Bliss* and *Francis R. Riddle,* solicitors for complainants.

*Moran, Mayer & Meyer, Henry M. Bacon, George S. Baker, Bangs, Wood & Bangs, J. A. Burhans, R. A. Burton, Gurley & Wood, Holt, Wheeler & Sidley, A. B. Jenks, Samuel A. Lynde, J. B. Mann, Matz, Fisher & Boyden, Murry Nelson, Jr., W. S. Oppenheim, Paden & Gridley, Orville Peckham, Remy & Mann, Runnells & Burry, Smith, Helmer Moulton & Price, Swift, Campbell & Jones, Leroy D. Thoman, Wagner & Kendig, Wilson & Cook, Walpole Wood,* and *Frank Crozier,* solicitors for various defendants.

TULEY, J.:—

The statement of this case by Master Leaming is, in substance, that the complainant, the Buda Foundry and Manufacturing Company, an Illinois corporation, a simple contract creditor (in the sum of $9,378) of the Columbian Celebration Company, also an Illinois corporation, on June 10, 1893, filed its bill of complaint under section 25, chapter 32, of the Revised Statutes, on behalf of itself, and all other creditors against the latter company and numerous parties alleged to be stockholders of said defendant corporation; alleging that said Columbian Celebration Company had ceased to do business, leaving unsecured debts unpaid, amounting to more than $300,000; that its assets did not amount to more than $50,000, and that it carried an incumbrance, a trust deed, purporting to secure $800,000 of bonded indebtedness of said corporation, and also alleging that the stock of said corporation had not been paid.   The said bill of complaint, commonly called a "winding-up" bill was subsequently amended.

The master then refers to the filing under said section 25, of a prior bill, by Steele Mackaye, against the Columbian Celebration Company, on the 30th of May, 1893, which bill is

alleged to have been fraudulent and collusive. The master sets out the proceedings and pleadings on such prior bill, which are unnecessary to specify in this opinion, as the same was subsequently dismissed out of this court.

The defendants herein, (over one hundred in number), having been brought into court, issues were joined, and the cause referred to Master Leaming in November, 1895. Before the reference numerous parties had been made co-complainants.

The master's report was filed in this court in June, 1902, and now comes up on exceptions. It appears from the evidence reported by the master, that Steele Mackaye, one of the defendants herein and the chief promoter of the Columbian Celebration Company, had, prior to the formation of said company, formed a scheme in connection with one Crosley and others, for the organization of a spectacular show of a somewhat similar nature to that contemplated by the Columbian Celebration Company's charter, in which were to be used all or nearly all of the inventions that were subsequently transferred to the Celebration Company, and to that end as early as the 16th of December, 1891, said Mackaye caused an application to be made and filed with the secretary of the state of Illinois, for the incorporation of the "Spectatorio Company," the object of which was stated to be, "the ownership, sale and licensing and presentation of spectacles, dramas, operas, pantomimes and other forms of theatrical and dramatic character, and the ownership, sale, licensing and use of every form of invention and improvement, in the art of producing effects of whatever character upon the stage."

Authority to take subscriptions of capital stock to the amount of $100,000 in $100 shares, was duly issued, and the capital stock was subscribed for as follows: Steele Mackaye, 998 shares; Powell Crosley, 1 share; Louis B. Uttz, 1 share; and the three were elected directors on the 11th day of January, 1892. A charter was issued to the company on the 13th of January, 1892.

It appears, however, that Mackaye, Crosley and others interested in promoting the Spectatorio Company (which was intended to be used in connection with the World's fair of

1893), concluded to broaden their project, and in place of a show with a capital of $100,000, to project a much more extensive one with a capital of $2,000,000. This resulted in the organization of the defendant, the Columbian Celebration Company.

The master finds as to the organization of the Columbian Celebration Company, "that, in the latter part of 1891, Steele Mackaye conceived a scheme to build an enormous building for the purpose of introducing and exhibiting spectacular plays and pantomimes at Chicago, Illinois, with particular reference to the World's Columbian Exposition there projected, so that the large attendance upon said exposition then anticipated could at least, in part, be attracted and induced to contribute to the financial benefit of the scheme of Mackaye. Mackaye was a man of considerable experience in theatrical matters, of an inventive mind, daring, forceful and magnetic. At this time he had small financial resources, but had conceived some novel and brilliant plans for stage effects by mechanical and electrical means. Mackaye was joined in the scheme by Benjamin Butterworth, an ex-commissioner of patents and a patent lawyer, and Powell Crosley, residing at Cincinnati, Ohio, as promoters of the enterprise; W. L. B. Jenney, an architect of Chicago, was applied to by Mackaye to assist him in drafting and formulating the ideas of Mackaye into practical form and expression; that on or about the 16th of May, 1892, articles of incorporation were certified to by the secretary of the state of Illinois, for the incorporation of the Columbian Celebration Company, with capital stock of two million dollars; 20,000 shares, par value $100 each, of which Steele Mackaye had subscribed for 19,996 shares; Benjamin Butterworth, 1 share; Powell Crosley, 1 share; Stephen C. White, one share; and Howard O. Edmonds, one share; all of whom were made and constituted the board of directors. That the above Stephen C. White was the clerk of Mackaye, and Howard O. Edmonds was the clerk of Butterworth."

On the 16th of May, 1892, was held the first meeting of the board of directors, at which all the above named were present,

excepting Crosley. Butterworth was made president; Crosley, vice-president, and White, secretary. At that meeting a resolution was adopted to the effect that: "The officers of the company are hereby authorized and directed to close the contract with Steele Mackaye for certain inventions, rights, privileges and property, according to the terms embodied in the contract this day submitted to the board, a duplicate copy of which is on file in the office of the secretary of this company, and that the president and secretary be directed, on delivery to the company by Mackaye of a good and sufficient assignment of the rights, inventions, property and interest, etc., mentioned and referred to in the contract, to issue to him as full and final payment for said inventions, etc., 19,996 shares of the capital stock of the company; he to accept the stock and the royalty provided for in the contract and assignment, in full satisfaction and discharge of the consideration for said inventions, etc. The said inventions, etc., being accepted by the company in full payment of the par value of the stock so issued, making the same full paid and non-assessable."

On said 16th day of May, 1892, at said meeting of the directors of the Celebration Company, an agreement in writing was entered into between the corporation and Steele Mackaye. This contract recited, in substance, that Mackaye had invented a large number of new, useful and valuable improvements in scenic art for the advancement and development of realism and nature in that art; the inventions named in the agreement and the object and purpose of the same, respectively being set forth, are numbered from 1 to 11, viz.:

1. Sliding stages; 2. Floating stages; 3. Telescopic stages; 4. Apparatus for producing scenic effects, (a) Illumiscope, or a combination of reflectors, (b) Colorators, or drums of colored paper, glass, etc.; 5. Wave maker; 6. Automatic proscenium adjuster; 7. Luxauleator, or curtain of light; 8. Automatic interpreter; 9. Apparatus for producing scenic effects and increasing realism; 10. Cloud creator, or nebulator; 11. A spectatorium and a spectoria, "The Great Discovery," and a scenario, the same duly copyrighted by Mackaye.

The number of the respective applications for patents for each of said inventions (except the 11th) appear in the agreement; also their dates respectively, which date is alleged to have been the 25th of May, 1892, although such date was nine days after the day the agreement was made, to-wit, the 16th of May, 1892. The date of the application for the 11th is recited as that of December 12, 1892 (the evidence tending to prove that said numbers of the respective applications and the dates when the same were made, were left blank in the original contract, and subsequently inserted).

The agreement further recites that the company desires to obtain the exclusive right to use in seven states, etc., said several inventions, etc., for the purpose of producing spectatorios, and particularly "The Great Discovery," the said company being organized for that purpose.

Mackaye, in consideration of 19,996 shares of the stock of the Celebration Company delivered to him (the company having accepted the rights, property, privileges and franchise assigned by Mackaye as payment in full of said shares of capital stock), and the payment to him of the royalty as thereinafter provided, he, Mackaye, sells and assigns to the company the sole and exclusive right to the said several inventions, and the use of the spectoria within said territory, and all improvements made thereon; but, on condition that the company pays to Mackaye, or his assigns, a royalty of ten per cent. on the gross receipts on the sale of admission tickets, to be ascertained and paid daily, and with the provision that the term of the contract should be ten years, after a lapse of which, all the rights, inventions, franchises, etc., granted, were to revert to Mackaye.

On the 21st of May, 1892, the stock was issued to Mackaye evidenced by certificate No. 1, for 19,996 shares, and on the same day Mackaye, in consideration of 998 shares of the capital stock of the Spectatorio Company (received by that company in full payment of his subscription) assigned to said Spectatorio Company the same inventions, rights, privileges and franchise, subject however, to the license given to the

Columbian Celebration Company; and also at the same time assigned his right to the royalty of ten per cent. from the Celebration Company.

The evidence shows, and the master so finds, that on neither the 16th nor the 21st of May, had any application been made for said patents, and Steele Mackaye then appeared to be the owner of all the stock of the Celebration Company, except four shares; and all the stock of the Spectatorio Company, except two shares; that on said 21st of May, no money or other property had been paid on any of the capital stock of the Celebration Company, and that its assets consisted of claimed devices and inventions of Mackaye, not then developed, or in any manner practically applied; that the sale of inventions from Mackaye to the Celebration Company was practically a sale to himself; and that, of the directors who voted for such sale, Edmonds and White were dummies, and Butterworth was a promoter of the enterprise with Mackaye, assisting him in carrying out the scheme; also that none of such inventions or devices had ever been practically applied or tested.

The record book of the Celebration Company shows that the next day after Mackaye received his certificate of stock, on, to-wit, the 22nd of May, he transferred of said stock of the Columbian Celebration Company 1,542 shares to said Butterworth; 1,542 shares to said Crosley; had the old certificate cancelled, and directed new ones to be issued for said amounts of stock to each said Butterworth and Crosley, and the balance to himself. Also, that on the 17th of May (the next day after the agreement that the Celebration Company would take in payment for Mackaye's subscription an assignment of said inventions, etc.) the board of directors of the Celebration Company, by a preamble and resolutions, declared that the company would require, for the purpose of effectually promoting, etc., and carrying out the business for which it was organized, the sum of $800,000, and desired to raise the same by the sale of $800,000 of its first mortgage bonds, and directed the president to procure the bonds Nos. 1 to 800, for $1,000 each, with interest coupons, interest at seven per cent. per annum, payable July 1, 1893, and January 1, 1894, at the American Trust.

& Savings Bank, Chicago, the principal of the bonds being payable on or before January 1, 1894, at said bank, the bonds to be secured by a mortgage or trust deed of the Celebration Company to the said bank as trustee, upon all the property acquired, or to be acquired, and all franchises, effects, etc., incomes and other sources of revenue of the Columbian Celebration Company. The master finds that. in order to facilitate the sale of the bonds and raise money for erecting a building and securing a site for the same, and for working out the designs of the Celebration Company, Mackaye agreed, and did contribute, 8,000 shares of its capital stock, so obtained by him from the Celebration Company, to be used as a bonus, to induce subscriptions to the bonds of the corporation, and that the Celebration Company and Mackaye caused to be transferred to said American Trust and Savings Bank, 8,000 of such shares to be held by said bank for the use of said company, and under its direction to transfer an amount of said 8,000 shares, whose par value should equal the par value of the bonds subscribed and paid for by any person to said Celebration Company (when notified by the Celebration Company of such payment) ; and to hold the remainder subject to the order of the Celebration Company; and that the American Trust & Savings Bank had no interest in said 8,000 shares, but simply acted as a conduit.

The evidence shows that a prospectus of the enterprise was issued and circulated by the Celebration Company, Mackaye and other promoters of the enterprise, in the spring and early summer of 1892. It states that, "Every one purchasing a bond, obtains in addition to the bonds bought an amount of the stock of the company equal to the amount of the bonds he has purchased." The exact dates when the circular containing that clause was first circulated, does not clearly appear, but the evidence raises a satisfactory presumption that the raising of money by the sale of mortgage bonds, with a bonus of stock, was a part of the original scheme of Mackaye, Butterworth and the other promoters.

The Celebration Company sold upwards of $500,000 of its bonds upon the terms set forth in a certain subscription agree-

ment, and it is upon this subscription agreement that the main contest in this case as to $500,000 of stock liability arises. The subscription paper is as follows:

"We, the undersigned, hereby severally subscribe to the number of first mortgage bonds of the Columbian Celebration Company set opposite our respective names, and we severally agree to pay for the same one thousand dollars ($1,000) each, at such time and in such installments as the board of directors of such corporation may request. This subscription is made on the condition that the said bonds are made preferred in payment by the said corporation, and on the further condition that the said bonds draw interest at the rate of seven per centum per annum from the date of subscription; and on the further condition, that upon full payment being made for the bonds subscribed for, each subscriber shall be entitled to receive, and there shall be delivered to him by the American Trust & Savings Bank, trustee, an amount of the full paid, and non-assessable capital stock of the Columbian Celebration Company, equal in par value to the par value of the bonds so by him subscribed and paid for.

"Chicago, July 6th, 1892."

Nearly all of the defendants sought to be made liable as stockholders in this proceeding, are alleged to have become subscribers to said agreement and to have become liable as holders or owners of a part of the $800,000 of stock placed by the Columbian Celebration Company and Mackaye, with the American Trust & Savings Bank as trustee. A few of the defendants (among them J. Foster Rhodes, the two Gillettes, and one Drake, and some one or two others) are sought to be held liable also on stock issued by the Celebration Company to Mackaye other than the 8,000 shares of stock which were turned over to the American Trust & Savings Bank aforesaid.

The first question presented is, whether or not the 19,996 shares of the stock issued to Mackaye in exchange for an assignment of the right to use said inventions, etc., was in fact stock fully paid for as against the creditors of the corporation, who have filed the bill in this case under said section 25 of the Incorporation Act.

It is established law in this state that the capital stock of a corporation is a trust fund for the payment of its debts, and if the stockholder has not paid his subscription in full, he is liable for the debts of the corporation to the extent of the unpaid portion of his subscription; that this trust fund consists, not only of the capital actually paid in, but also of that which the stockholder has promised to pay in. The amount unpaid upon stock which has been issued, is as much a part of the corporate assets for the payment of creditors as the money which has been paid in upon such stock; that any device between stockholders themselves or between them and the corporation by which its liability to creditors is sought to be avoided, is void, whether the transaction be binding or not between themselves.

It is also well settled that property may be taken in payment of subscriptions, but when it is taken at an overvaluation (which overvaluation is so great that fraudulent intent appears upon its face and is not explained), the court will hold such an overvaluation to be void as a matter of law; that an honest mistake as to the value of the property will not invalidate the transaction, but that there must be an honest attempt to arrive at the actual value of the property and an entire good faith must characterize the transaction.

If the property contributed in payment for the subscription for the shares is not valued in good faith, or if it is taken without regard to its value, or if there is an intentional overvaluation by the directors, the shares of stock issued therefor will not be considered fully paid up in law or in fact by the contribution of such property. If such property is entirely worthless, the stock will be considered wholly unpaid, and the courts have established and enforced an inflexible rule that payment for stock subscriptions is good as against creditors, only when the payment has been made in "money or in money's worth."

The capital stock is held in trust by the directors and they cannot sell or give it away or transfer it without receiving payment therefor in money or in money's worth. This is the doctrine established by our supreme court in Coleman v.

*Howe,* 154 Ill. 458, *Union Mutual Life Insurance Co. v. Frear Stone Manufacturing Co.,* 97 Ill. 537, and numerous other cases in our state cited by the decisions quoted. The underlying requisite of a valid exchange of property for the subscription of shares is that there shall be good faith on the part of the directors. The law does not require that they shall be infallible in their judgment as to the actual value but if the exchange is made in such a way and under such circumstances as to show an intentional overvaluation of the property taken, or no valuation, in fact, or that the pretended exchange was a mere device to get possession of the stock without payment of the subscription, the transaction will be deemed fraudulent in law and in fact. Whether the directors in making such an exchange acted in good faith or not, must be determined from all the circumstances surrounding the transaction.

The inventions of Mackaye (in the right to use which consisted the entire consideration for the $1,999,600 of Mackayes subscription), were, at the time such exchange was made, (according to the testimony) exceedingly crude and undeveloped, had never been in use and had no known value. It was not even known whether or not they were inventions which were susceptible of being patented, as no applications for a patent or even any *caveats* in regard thereto had been filed in the patent office at Washington.

The directors consisted of Mackaye, Butterworth, Crosley and two clerks, White, a clerk for Mackaye; and Edmonds, a clerk of Butterworth; two of these directors, Butterworth and Crosley, were substantially interested with Mackaye in carrying through this fraudulent exchange of property for the subscription. This clearly appears from the evidence, and also by the fact that upon the very next day after the exchange was made, Mackaye transferred to each (Butterworth and Crosley) 1,542 shares of the stock.

At the time the resolution authorizing the exchange was passed, Mackaye did not vote, and Crosley was absent; Butterworth and the two clerks being a majority of the board, voted for the exchange. Butterworth had been United States commissioner of patents, but it does not necessarily follow

that he was an expert, competent to judge of the value of these inventions, and the evidence fails to show that either of the clerks had any knowledge of the value of the inventions in question.

Butterworth and Mackaye died before their evidence was taken in this case, and Crosley has not testified as a witness. We have not, therefore, even their declarations under oath that they honestly believed these inventions to be worth the immense amount of money paid for them. Judging as to the good faith of the transaction, by their acts and surrounding circumstances, I am satisfied there was no honest exercise of judgment by the directors, or any of them, as to their value. There was no honest discussion or inquiry as to the value of such inventions or any one of them. The exchange was evidently a cut and dried affair, a fraudulent scheme of Mackaye, Butterworth and Crosley to obtain possession of the capital stock of the company and relieve Mackaye from payment of his subscription without paying therefor anything of known value, with the understanding or purpose that such part as might be necessary should be returned to the corporation to be used by the corporation in promoting and putting into operation the enterprise.

It was impossible at the time of such exchange, to fix any money valuation upon the so-called inventions, and any valuation fixed upon them at that time must necessarily have been purely imaginative, speculative and not based on what they were worth, or what they would sell for.

It is a fair inference from the evidence that Mackaye and his assistants, Butterworth and Crosley, originally intended that the inventions should be transferred to the Spectatorio Company in exchange for $98,000 of the $100,000 of the stock subscribed for by Mackaye, and that such exchange would have been made and the inventions turned in for $98,000 of that stock, had it not been for the opportunity to turn them in, at their own volition, to the Celebration Company at $2,000,000 (less $400).

It is true the court must put itself in the place, as far as it can, of the parties at the time of the transaction, and that the

fact that said inventions and the patents for the same after
the lapse of ten years are still in the hands of the receiver,
unsold, and that he was unable to sell them at any price, does
not necessarily show that the inventions were worthless, or
that the parties to the transaction knew that they were worth-
less at the time the transaction took place, but it must be con-
sidered as to those inventions (several of which it was claimed
could be made useful for theatres and other shows of like na-
ture) that the fact that they have remained without a pur-
chaser being found therefor, for this long period of ten years,
strongly tends to show that there was no intrinsic value to
said inventions, or any of them. They appear to have become
absolutely worthless, immediately upon the assignment to the
receiver in May, 1893.

The evidence shows that in the building for the show that
was planned and partially constructed, several of the inven-
tions were not used and others could not be used; that the al-
leged inventions taken as a whole, for the purposes of the
spectacular show to be given in that building, were practically
of no value whatever. It must also be taken into consideration
in judging of the good faith of this transaction, that the direc-
tors, Mackaye and his promoters, knew that the corporation
had obtained no land, or right to any land, or site, for the
projected building, and that it had no means of obtaining any
money, except from its subscriptions.

Property taken in exchange for subscription money must be
something substantial, capable of pecuniary estimation and
not shadowy. A guess or an estimate as to the value of the
right to use such inventions based entirely on speculative
profits from the future use of such inventions, cannot in
reason be held an equivalent for the nearly two million dol-
lars which were due upon Mackaye's subscription.

It is impossible to arrive at any other conclusion than that
there was practically but one side to this transaction, Mackaye
and his assistants were simply making a sham trade between
Mackaye and the corporation, using the corporation for their
own personal ends in fraud of the creditors of the corpora-
tion. The language of the supreme court of Maryland in

*Crawford v. Rohrer*, 59 Md. 599, where there was a sham sale of property in payment of subscription for stock is pertinent to the case at bar: "Any arrangement between stockholders or those in charge of the affairs of the corporation, by which the stock is but nominally paid up, whether in money or property, the corporation not in fact getting the benefit of the price in good faith, will be regarded as a sham, and not as a valid payment as against the creditors of the corporation, however it may be regarded as between the corporation and the subscribers," and that "as between the creditor of the corporation and the original holders of the stock, it in no manner affects the rights of the former that the stock has been issued as fully paid up stock, for their rights depend, not upon the mere appearance of things, but upon the actual, *bona fide* payment by the stockholder, whether that payment be alleged to have been made in money or in money's worth."

The evidence shows that it was a part of the original scheme of Mackaye, Butterworth and Crosley that an amount of the stock that might be deemed necessary was to be returned to the corporation to be used for promoting the enterprise, which stock was to be held and used by the corporation practically as treasury stock.

Certificate No. 1 for 19,996 shares of stock was issued to Mackaye on May 21, 1892, nominally in payment of his subscription, and was, either upon that or the next day, returned to the Celebration Company, with a statement on the back in Mackaye's handwriting that he assigns 1,574 shares to Crosley; 1,574 to Butterworth, and "to myself 7,349 shares, and —— shares," and, in the handwriting of White, the secretary, over an erasure written in said blank the figures, "9,499," and in pencil, also in White's handwriting, after the "9,499 shares," the words, "for promotion."

On the 17th of May, four days after the stock issued to Mackaye and the next day after its issue was authorized, the board of directors of the Celebration Company—only Mackaye, Butterworth and the two clerks being present—passed a resolution in substance reciting that the corporation "would

require for the purpose of effectually promoting  *  *  *
and carrying out the business for which it was organized, the
sum of $800,000, "and desiring to secure the same by a first
mortgage, authorized a trust deed mortgage to be made to the
American Trust & Savings Bank as trustee, on all its prop-
erty to secure $800,000 of its own mortgage bonds." And it
also appears that on that or the next day a certificate issued
to Crosley for 1,574, to Butterworth for 1,574, and to Mac-
kaye for 7,349 shares, leaving 9,499 shares unissued.

On the 28th of July 1892 (which was after the Union
League dinner), certificate No. 21 for 9,499 shares was is-
sued to Mackaye, but was cancelled, Mackaye stating to the
secretary that it was a mistake as there were a certain num-
ber of shares to be issued to a trustee, and used by the Cele-
bration Company to promote the bond sales, but on the re-
ceipt which Mackaye gave to the secretary for the certificate
so issued to him, there appears in White's handwriting, the
words, "From the company." Nothing was done with these
9,499 shares until August 26th, when a certificate for 8,000
shares was isssued and delivered to the American Trust &
Savings Bank as trustee, and at the time of the delivery, the
Celebration Company notified the bank that the 8,000 shares
were to be held by the bank as trustee under the subscription
agreement, and that under the subscription agreement bonds
to the amount of $500,000 had been duly subscribed for.

The American Trust & Savings Bank, at no time, knew
Mackaye in connection with either the bonds or the stocks
delivered to it. A memorandum of the secretary on the
back of certificate No. 1 marks this balance of 1,499 shares
issued to Mackaye as being "for promotion," and by a sub-
sequent entry, that the 1,499 shares were issued the 8th of
April, 1893, to Powell Crosley, trustee. This issue of the
1,499 shares to Crosley appears to have been done by the cor-
poration without any order from Mackaye.

This and other evidence tends strongly to show that when
the pretended transaction of receiving the right to use the
inventions in payment of Mackaye's stock subscription took
place, it was understood that a large amount of stock was to

be returned to the company, to be used "for promotion." It is clear from the testimony that at the time the subscription agreement was first signed by any subscriber, the $500,000 of stock was a part of the stock held by the corporation for promotion, or, in other words, as treasury stock. The evidence shows that some of these 8,000 shares of stock were used by the corporation as collateral security, and that all identity of the 8,000 shares returned to the corporation by Mackaye was lost; that such shares were covered into the treasury and treated as unissued shares from the time they were so returned by Mackaye to the corporation.

Not only was there in fact no valuation of the inventions had, but there was nothing tangible to value, and the pretended exchange between Mackaye's liability for $1,999,600 on his subscription for the right to use the inventions was a sham transaction, a device to give the stock the appearance of full paid stock so that a large proportion of it could be used for promoting the corporate purposes, and the balance be used by Mackaye, Butterworth and Crosley for their own purposes, without anything of actual value having been given for any of said stock. It was a transaction which was both fraudulent in law and fraudulent in fact.

The next question to be considered arises upon the subscription agreement referred to, by which, upon payment for bonds, the subscriber was entitled to receive in addition to the bonds, an equal amount of full paid and non-assessable stock. By that paper the subscribers agreed to take and pay for bonds to the amount set opposite their respective names on condition, "that the bonds be preferred in payment and draw interest at seven per cent. from date of subscription, and on the further condition that upon full payment being made, for the bonds so subscribed for, each subscriber shall be entitled to receive, and there shall be delivered to him by the trustee, the American Trust & Savings Bank, an amount of the full paid and non-assessable capital stock of the Columbian Celebration Company equal in par value to the par value of the bonds so by him subscribed and paid for." When the subscription paper was signed, where now appears the name

"American Trust & Savings Bank," there was a blank, which was afterwards filled with that name, but such fact has no material bearing on the construction of the agreement. Several copies of the subscription paper were circulated, and signatures obtained thereto. The original subscription paper bears date July 6, 1892.

It is contended by certain defendants that the agreement designates no particular stock by number or by description other than that it shall be stock of the Columbian Celebration Company, and that as the $800,000 of stock deposited with the American Trust & Savings Bank for the purpose of carrying out said subscription agreement was not, in fact, full paid and non-assessable stock, they were not bound to receive such stock as a compliance with said condition.

Neither the American Trust & Savings Bank, nor the Columbian Celebration Company signed the agreement, but the American Trust & Savings Bank subsequently accepted the position as trustee, and the Columbian Celebration Company received such subscription agreement and both acted under it.

It does not appear upon the face of the agreement that the stock was, at the time of the signing of the same, in the hands of the trustee (the evidence shows that it was not) nor is there any express obligation on the part of the Columbian Celebration Company to place any stock with the trustee, but it appears that it did (when, does not appear) receive the 8,000 shares of stock from Mackaye and deposited the same with the American Trust & Savings Bank for the purposes of said subscription agreement.

It is apparent upon the face of the subscription agreement that it was the intention that the trustee act as a mere conduit to pass the stock deposited with it to the subscribers upon the payment of their several bond subscriptions; in other words, that it was to hold said stock in escrow for that purpose.

It is also apparent that no particular shares of stock are designated, but if, in fact, the subscription agreement was executed with reference to any particular stock, it must be

admitted law that parol or other evidence is admissible to show with reference to what particular stock the agreement was made in order to identify the same. The question arises then, whether the evidence in this case shows that any particular stock (as, for instance, the Mackaye stock) was the identical stock as to which said subscription agreement was entered into. The evidence upon that point will be discussed later.

If such evidence shall be found to identify the stock which was to be delivered by the trustee as part of the same stock that had been issued to Mackaye, such identification would be a complete answer to the contention that the subscription paper itself does not identify the particular "full paid and non-assessable" stock that was to be delivered.

It is contended the agreement calls for "full paid and non-assessable" stock, to be delivered in the future, and if the stock deposited with the bank was not such stock, the Celebration Company was impliedly obligated to make it full paid before its delivery to the subscribers. Neither the bank, which was a mere conduit, nor the Celebration Company signed the agreement, but the latter accepted and acted upon it.

The subscription agreement containing no express undertaking by the Celebration Company that the stock which was to be delivered by the American Trust & Savings Bank should be "full paid and non-assessable" stock, or that the Celebration Company would make it such, the mere fact that the Celebration Company did receive such stock for Mackaye, and did deposit the same with the said bank for the purposes of said agreement, did not, under the circumstances in evidence, impose any obligation upon said Celebration Company to make such stock "full paid and non-assessable" before its delivery under said agreement.

It is also argued that, because the stock in question was marked "full paid and non-assessable" stock, the subscribers to the subscription agreement were not bound to look beyond the face of the stock or make any inquiry. That depends

upon the construction to be given the subscription agreement, taking into consideration all the circumstances under which it was executed.

The mere fact that the stock was issued as full paid stock did not make it so in fact.

The supreme court of the United States, in the leading case of *Upton v. Tribilcock,* holds that a promise to take a share of stock imports a promise to pay for it, and the same effect results from the accepting and holding a certificate of stock, and although the stock in that case was stamped "non-assessable," the court says: "We can see no qualification of the result from the fact that the stock was so stamped. The fact of stamping it 'non-assessable' did not make it so." *Upton v. Tribilcock,* 91 U. S. 45. See also *Crawford v. Rohrer,* 59 Md. 599.

It is also contended by some of the defendants that a court of equity will treat the money paid under the subscription agreement as paid upon the stock, as against the claim of creditors becoming such with knowledge that the stock was unpaid.

There is no equity in such contention. The right of the creditors is founded upon the statute, and the liability of the stockholder is also statutory. The law demands that that portion of the trust fund represented by the stock which is unpaid shall be paid to the creditor, and it is no answer to this demand, as expressly decided by our supreme court in *Sprague v. National Bank of America,* 172 Ill. 149, that the creditor knew at the time his indebtedness was created that the stock was unpaid.

Are the defendants who signed the subscription agreement *bona fide* purchasers for value? The master finds (page 33 of his report) as follows:

"I find from the evidence that all of the subscribers to the contract Exhibit 2 to Gardner's testimony (which was the subscription agreement) were informed of the fact that the capital stock therein contracted to be delivered on payment by them for the bonds, was to be given as a bonus, and that as a matter of law such subscribers were put upon inquiry

as to the character of the stock and the right of the corporation to so dispose of such stock at less than par. I therefore conclude that if such subscribers did not inquire as to how such corporation acquired such stock and whether or not it had been fully paid for, then the law holds them chargeable with that knowledge which a reasonable inquiry would have disclosed of the facts, to-wit: that said stock had never been paid for as required by law.'' If the evidence sustains the finding of the master no fault can be found with his conclusion. If the subscribers to the agreement (or contract, ''Exhibit E'') took the stock as a bonus, or became liable as stockholders having paid nothing for the stock they took it *cum onere*. If it was unpaid stock, they must pay for the same, and cannot claim to be purchasers of the stock for value.

The master does not pass on the question of whether, upon the face of the subscription agreement, the stock was a bonus, nor was it necessary for him so to do. His finding that it was a bonus is based upon all the evidence in the case *ex facto oritur lex*. The master's finding must be held to mean that under all the circumstances surrounding the execution of the subscription agreement, the subscribers were put upon inquiry as to whether this stock which they agreed should be theirs upon payment of the bonds, was in fact fully paid and non-assessable, and he construed the written agreement in the light of such circumstances.

It is not controverted that if the subscriber was informed of the fact at the time of or before the subscription, that said stock was not fully paid and non-assessable, or if he had notice of facts or circumstances which would put a reasonably cautious, prudent man upon inquiry as to whether said stock was, in fact, fully paid and non-assessable, and failed to make such inquiry, he is liable for the amount unpaid upon the stock received by him, or as to which he became the owner, legal or equitable.

It is contended that the subscription agreement·is in law a purchase of both bonds and stock and that the stock is not a bonus or gift as contended by complainants. This involves

a construction of the agreement. The complainant cites authorities to show that the stock is to be considered a bonus or gift. The defendants cite authorities to show that it is to be considered as a purchase of bonds and stocks, and if the corporation owned the stock which it had once issued as paid up stock, it having again become the owner of it, it could sell it with the bonds for what it could obtain, like any other owner of stock.

There is much reason to contend, upon the Illinois authorities, that this is an agreement to become a stockholder, an agreement in the nature of a subscription for stock. No particular form of words is necessary to make an agreement to become a stockholder. If the contract amounts to an agreement to take from the company its stock, that is sufficient.

In *Alling v. Wenzel*, 133 Ill. 264, where by an ingenious system of bookkeeping the stock was transferred to and stood in the name of the corporation which afterwards sold the stock to different persons at ten to twenty cents on the dollar, the stock never having been paid for, the purchaser buying the same directly from the company, was held liable as an original subscriber for the amount remaining unpaid thereon. And in another case where a party signed an agreement in substance promising to pay a certain sum to a railroad company when a certain amount of construction was done, and upon the payment of the money a certificate of stock for a like amount to be issued to the promissor on demand, the court held that it was a subscription to the capital stock of the corporation, and not a purchase of stock. *O. & F. R. V. R. R. Co. v. Black*, 79 Ill. 262. To the same effect *Wemple v. St. L. J. & S. R. R. Co.*, 120 Ill. 196.

If it was understood or agreed at the time of the alleged exchange of the right to use Mackaye's inventions for the 19,986 shares of stock issued to Mackaye that he should return to the corporation the 8,000 shares, or that a sufficient number of shares for promoting the enterprise should be returned to the corporation, there was not in law any issue of the stock so returned. In any view of the transaction Mackaye returned to the corporation 8,000 shares of stock, which

the court has found he fraudulently and illegally obtained. He did not sell it back to the corporation nor did he obtain or claim any consideration for returning it to the corporation. The stock was put back into the treasury of the corporation, without anything being paid for it, going or coming, and the corporation, as to this stock, stood in the same position as if it had never issued the stock to Mackaye.

The corporation issued new certificates for these 8,000 shares, just as it would have issued them to an original subscriber for shares. There was no assignment to the bank nor to any subscriber of any of the original certificates issued to Mackaye. The original certificate issued to Mackaye, so far as this 8,000 shares was concerned, was treated as if it had never been issued. The legal effect of the subscription to the agreement was to make the signers thereto subscribers to the capital stock of the corporation upon the payment of their respective subscriptions for bonds, and liable as such stockholders under the cases above cited.

The "subscribers" were presumed to know that the corporation could not legally issue full paid stock to any one agreeing to become a stockholder without the same being paid for in money or in money's worth, and that issuing the stock as full paid and non-assessable stock, did not make it such so far as creditors might be concerned. Upon such construction the subscribers were not assignees, but subscribers for unissued stock and chargeable with the knowledge that the capital stock represented by such shares was a trust fund for creditors, and that all subscriptions for stock must be paid for in money or in money's worth. Either this must be held to be the true construction of the paper, or it must be held a subscription for (or purchase) of bonds. Upon either construction the stock was a bonus or gift, and being such the subscribers receiving the same, on becoming the owners thereof, legal or equitable (having paid nothing therefor) would be liable for the amount unpaid thereon and such subscribers would not, in either case, be *bona fide* purchasers of the stock for value.

Upon the face of the agreement, without considering the

surrounding circumstances, it is clear that the stock is a bonus or premium for the bond subscription, and there is no evidence tending to show that the agreement was intended or understood to be for the sale of bonds only, or a purchase of bonds and stock by the subscriber.

The trust deed to secure the payment of the bonds (with the contents of which the subscribers are chargeable) authorized by resolution of the directors of the Celebration Company, on the 17th of May, contains no reference to stock, and the agreement as to the stock was presumed to be made knowing that fact—it evidently was made without regard to the provisions of such trust deed. In fact, as will hereafter be seen, Mackaye had on the same date that he got certificate No. 1 for 19,996 shares or on the next day, returned the same to the corporation, and obtained new certificates as hereinbefore stated.

As to those defendants who signed the subscription agreement and paid for the sum subscribed for, but neglected or refused to accept of the stock; did they become the owners of such stock which had been deposited with The American Trust & Savings Bank upon the payment of the bond subscribed for? The true construction of the agreement upon this point is that the American Trust & Savings Bank held the stock in escrow, to be delivered to the subscriber for bonds when he paid for the bonds, and that, *eo instanti* upon such payment being made, the subscriber became entitled to the stock; that is, he became the owner of such stock, could have compelled its delivery to him, and would have been entitled to all the dividends thereafter earned by such stock. After such payment the stock was such subscriber's, and the bank held it for him and subject only to his demand.

It was not in the power of such subscribers to rescind the contract as to the stock and affirm it as to the bonds, nor could they, after their liability became fixed as stockholders (by the payment of the bonds), rescind such agreement, either in whole or in part, as against the creditors of the corporation.

As to those who refused or neglected to take either stock or bonds. The subscribers having paid for their bonds, as be-

fore stated, by such payment, became the owners of the stock deposited with the American Trust & Savings Bank, and thereby became liable to the creditors of the company as such owners of stock for the amount unpaid thereon; having incurred such liability they could not rescind the contract as against the creditors of the corporation. They occupied no better position than those who took the bonds but refused to take the stock.

The evidence fails to show any case in which the signer of the subscription agreement properly exercised any right to rescind the contract. The subscription agreement or contract was an executed agreement so far as the Columbian Celebration Company was concerned, and the liability of stockholders, had attached to the subscribers to the agreement before any attempt was even made by any such subscriber to rescind the contract. When such attempt was made, the right of a rescission did not exist.

The evidence clearly shows that nearly all the signers of the subscription agreement knew, and that the others had notice equivalent to knowledge that the stock referred to in that agreement, either had been or was to be turned back to the corporation by Steele Mackaye, was a part of the stock which had been issued to him in payment of his subscription, and that it had been or was to be deposited with the American Trust and Savings Bank for the purpose of carrying out the subscription agreement.

Those who signed said subscription agreement and received stock or became stockholders by paying for bonds, contend that they are purchasers of such stock for value and without notice, that it was not what it purported to be, to-wit, full paid and non-assessable. The doctrine laid down in *Coleman v. Howe*, 154 Ill. 458, by our own supreme court upon this point, is as follows: "A purchaser or assignee of stock which has not been fully paid does not become liable to the corporate creditors for the unpaid balance where the stock has been issued as fully paid and he has acquired the same in good faith and without notice that it has not been paid. But where a person purchasing stock issued as paid up, had notice that

it has not been paid, his liability is the same as that of the party who transferred it to him.   (Citing 1 Cook, Stock and Stockholders, 3 ed., secs. 49–50; *Jackson v. Traer,* 64 Ia. 469). The equitable doctrine, that the capital stock is a trust fund that may be followed by the creditors of the corporation, and that any balance remaining unpaid thereon may be reached, by such creditors, applies not only to original subscribers to the stock but also to purchasers or assignees with notice of the fact that all of the stock has not been paid for.''

The court has held that the transaction by which the stock issued to Mackaye in payment of his subscription of nearly two million dollars in consideration of the right to use the inventions of Mackaye, was a fraud in fact and in law as to creditors, and that such stock was not paid for in whole or in part.   Did the subscribers to the subscription agreement now sought to be charged as stockholders have knowledge of the fact that such stock was unpaid, or have notice of such facts or circumstances which would put a reasonable, cautious and prudent man upon inquiry, and fail to make such inquiry?

It appears from the evidence that as early as February, 1892, Steele Mackaye commenced to agitate at Chicago the proposition of building a great spectacular show, to be used in connection with the World's Fair, and the formation of a corporation that should build and run the same. Mackaye had made a model of the show, about sixteen by twenty inches, which he exhibited at the Auditorium, a leading hotel in this city.   These exhibitions attracted a very considerable atten-tion and were continued from time to time for a number of weeks and down to and after the month of July, 1892; that those exhibitions were carried on by Mackaye, who is charac-terized by one of the counsel as being ''a man of oriental imagination and hypnotic power.'' The exhibition was ac-companied with lectures by Mackaye upon the spectacular show and the History and Voyage of Columbus, scenes of which he intended to depict.   It is evident that nearly all the signers of the subscription agreement attended these exhi-bitions and heard these lectures.

According to the evidence, Mackaye at some of these lec-

tures stated the fact that the capital stock of the Columbian
Celebration Company, which it was proposed should build and
run this show, had been turned over to him in payment of
his inventions, and that in order to aid in erecting the build-
ing and putting the show in operation, it was proposed that
the Columbian Celebration Company execute a deed of trust
to secure eight hundred of its $1,000 bonds, the proceeds,
thereof to be used in and about the erection of such building
and putting such show into operation; and that he (Mackaye)
should turn over to the Celebration Company, out of stock
received by him, $800,000 of stock, which should be deposited
with a trustee; and that for every $1,000 bond, which should
be subscribed and paid for, an equivalent amount of such
stock so deposited with the trustee, should be delivered as
a bonus to subscribers for bonds.  He also in these lectures
dwelt at great length on the immense profits that were ex-
pected to be derived from the erection of this building, which
was to cost not less than $500,000, and perhaps $800,000.

A prospectus was issued, entitled "The Spectatorium Pros-
pectus," and was stated to be "a condensed presentation of
facts which commend the enterprise to the prompt attention
of investors as a perfectly safe investment with the certainty
of an exceptionally large and quick return;" that the World's
Fair would be an occasion that would never be again equaled
as an opportunity for money making; that millions of people
would crowd to Chicago during the exposition, and that an
investigation would prove to any investor that the Specta-
torium would be the most colossal and astounding attraction
ever offered to the public anywhere, any time in the history
of modern civilization; that it would present a most wonder-
ful celebration of the great event commemorated by the Co-
lumbian Exposition.  That George A. Pullman, Lyman J.
Gage, and others endorsed the enterprise; that it was a golden
opportunity for investment.  In addition to these gentlemen,
it referred to many others, all or nearly all of whom became
subscribers to the subscription agreement, among them Mr.
Butler, Mr. Ream, Mr. Ellsworth, Mr. Murray Nelson, Arthur
Dixon, Franklin H. Head, E. W. Gillette, Mr. Weaver, Mr.

Eckhart, W. L. B. Jenney, and others, and that the Specta-
torium would be a colossal structure, erected "to command
the clientage of the continent for years to come." That a
building would be erected or constructed for the production of
the Scenario, a new order of entertainment, upon the most
startling and sensational realism, with the most accurate
scholarship and the loftiest idealism; that the money for the
construction of the Spectatorium and the production of this
vast spectatoria, entitled "The Great Discovery," would be
raised by the sale of 800 first mortgage seven per cent. bonds
of $1,000 each, the bonds to be a lien upon the whole plant,
and the sole right to use the wonderful inventions covered by
ten patents," which had already been allowed by the patent
office in Washington, which gave the Columbian Celebration
Company the monopoly of the extraordinary entertainment
for seven states," including Illinois; that the money received
by the Columbian Celebration Company would pass through
the hands of a trustee of the bondholders; that the treasurer
of the trustee would have charge of all moneys received and
paid out until the bonds were paid; that the first receipts over
and above running expenses would be devoted to the paying
off of the bonds; that every one purchasing a bond "would
obtain in addition to the bonds an amount of the stock of the
company equal to the amount of the bonds purchased." Re-
fers to certain gentlemen who have consented to become di-
rectors of the Columbian Celebration Company, Lyman J.
Gage, Charles H. Deere, Edward H. Butler, Egbert W. Gil-
lette, George H. Fuller, John S. Runnells, W. D. Kerfoot,
Honorable Benjamin A. Butterworth, Franklin H. Head,
Henry E. Weaver and Steele Mackaye, but it appears that
Gage, Deere, Fuller, Runnells and Kerfoot never became di-
rectors.

That the estimate of the profits shows that if the Specta-
torium draws but one-half of the number of people per day
that usually patronize the Barnum & Bailey show in ordinary
times when there is no immense World's Fair crowd of sight-
seers in the city, the company will pay all the bonds with in-
terest in seventy days, and pay a dividend for the World's

Fair season of over eighty-four per cent. on $2,000,000, that being the amount of the capital stock of the Columbian Celebration Company; that the money capacity of the Spectatorium at ordinary circus prices would be about $15,000 for each performance; and, if necessary, they can give six performances a day; "if it does but half this business, it will pay off all the bonds in twenty days, and pay a dividend of 350 per cent. upon the capital stock." This prospectus is signed "Columbian Celebration Company, Room 53, Auditorium Building."

A copy of this prospectus was kept on file at the exhibition rooms and it appears to have been widely circulated.

The names of the prominent financial gentlemen referred to, undoubtedly gave great impetus to the movement.

On the 6th day of July, 1892, a dinner was given by Mackaye and Butterworth at the Union League Club, with the object of furthering the enterprise. At this dinner, Steele Mackaye and Butterworth, it appears made speeches and explained the undertaking, substantially as set forth in the prospectus, stating that the stock of the company had been subscribed for by Mr. Mackaye, and had been paid for by Mackaye by turning over to the company the right to use the inventions referred to, and that out of his shares of stock he, Mackaye, would return to the Columbian Celebration Company $800,000 of the same, to be given as a bonus to the subscribers to the bonds. Mackaye talked for more than an hour; he made, testifies Mr. Lyman Gage, "one of his characteristic talks; it was like a poem. It was descriptive as his other talks had been  *  *  *  they were graphic, glowing and convincing as to the power and beauty of his great scheme." It appears that the financial part of his poem was "his estimate of the earning capacity of the show. He figured 18,000 people at each exhibition, of which there were to be two in the daytime and two in the evening;" 72,000 people, at fifty cents each, making receipts of $36,000 per day.

It appears that Jenney also attended at that dinner, and made some remarks and estimates of the cost of the building. No definite estimate appears to have been given as to the cost

of the mechanism of the show, outside of the cost of the build-
ing, but it was estimated that the entire cost would be
$500,000, and could not exceed $800,000, the amount of the
bonds to be secured by the trust deed upon the property of the
Columbian Celebration Company.

All, or nearly all of the gentlemen named in the prospectus,
and quite a number of other substantial citizens (in all forty
or more) were present at this dinner.   Considerable enthusi-
asm prevailed, presumably caused by the glowing pictures
given by Butterworth and Mackaye of the Spectatorium show
that was to be exhibited and the immense profits which would
necessarily result to those investing in the bonds.   The evi-
dence does not show just how much of the bonds were sub-
scribed for upon that evening, but it was between $130,000
and $150,000.

The evidence shows that neither at that time, nor at the ex-
hibitions and lectures given by Mackaye, was there any in-
quiry made as to whether the inventions of Mackaye (or the
right to use the same) were worth the $2,000,000 (less $400),
which the Columbian Celebration Company had nominally
given for the same; nor was any discussion had in regard to
the monetary value of such inventions, or any one or more of
them.

The master finds from the evidence that all of the subscrib-
ers for bonds for which stock was given as a bonus upon
payment of the bonds, were informed of the way in which
such stock was purported to have been paid for, viz.: by the
agreement to assign interest in the patents of Mackaye; and
most, if not all, of them believed that such interest in patents
so assigned constituted full payment without reference to
any actual value of such patents or interest therein, and that
this is also true of the other holders of stock.

I do not agree with the master in his conclusion that most,
if not all, of such subscribers believed that such interest and
patents so assigned constituted full payment without refer-
ence to any value of such patents or interest therein.

I fail to find any evidence of inquiry by any such subscrib-
ers or any discussion by any of them, as to whether the in-

ventions were worth the $2,000,000 (less $400) paid for them by the cancellation of Mackaye's subscription. Nor was there any real discussion that I have been able to find from the evidence by any party, or any such subscriber, as to the value of any one or more of such inventions.

There is some evidence tending to show that George M. Pullman made some inquiries concerning the enterprise before he subscribed his $50,000 of stock, but the evidence is of such an indefinite nature as not to warrant the conclusion that it was an inquiry into the value of the inventions as payment for the Mackaye stock.

The conclusion that I draw from the evidence is, that the subscribers signed said subscription paper in the belief that the enterprise would prove a success, notwithstanding all its capital stock was given for the inventions; that none of them ever stopped to consider the question of value of the inventions or of any one of them.

The showing made by the promoters and by the prospectus as to the great profits to be realized from this enterprise—that the bonds, with interest, could be paid by the receipts in seventy days during the World's Fair and that the stock would earn dividends even to three and one-half times the face value of the bonds, and might earn a great deal more, etc.—had the effect to obscure and blind the inquiry of investors in the bonds as to whether the alleged inventions of Mackaye were, in fact, worth the amount of his subscription, viz.: $1,999,600, or as to what, if anything, they were really worth. The desire to realize such immense profits upon their investment apparently made the investors in bonds reckless or indifferent as to whether the capital stock (that trust fund for creditors) had, in fact, been paid into the corporation treasury in money or in money's worth; made them confident (even if the query as to whether the capital stock had, in fact, been paid for, suggested itself to them) that the venture would so certainly be successful that no possible danger as to the liability of creditors would be incurred.

Even if it be admitted that the signers of the subscription agreement honestly believed that the capital stock had been

fully paid for by the transfer to the corporation by Mackaye of the right to use his inventions, that would be an insufficient defense.

The court concurs in the master's finding upon that point, "that in order that such a belief should be available as a defense, that it must be based upon a statement of fact which the purchasers believed to be true, and which facts, if true, would constitute a sufficient payment of such stock. A mere statement of a conclusion either of fact or law by a third person is not in itself a sufficient foundation for a belief, which the law will recognize as relieving such persons from liability, but the facts from which such conclusion is arrived at must be considered."

The same reasoning will apply to the contention that it is sufficient if the defendants acted in good faith in signing the subscription agreement. It was doubtless the fact that the signers of such agreement, in good faith, believed that the enterprise would be a success, but that would be no defense if, as the court has found, they had knowledge or notice equivalent thereto, that this stock had not been paid for. *Higgins v. Ill. T. & S. Bank,* 193 Ill. 400.

The contention of some of the defendants, that the rule laid down by our supreme court in *Coleman v. Howe,* 154 Ill. 458, that the subscription to the capital stock of a corporation. must be paid in money or in money's worth, is modified or changed in any way by the decision in *Sprague v. National Bank of America,* 172 Ill. 149, cannot be sustained. In the latter case the court says: "We entertain no doubt but that a corporation organized under the laws of Illinois, may issue shares of its capital stock in payment of property of such a character as it may lawfully possess and use, and may agree with the subscribers as to the value of such property, providing the agreement is made in good faith and in the exercise of judgment fairly and honestly directed.

In the Coleman case the court say: "Cases may arise where stock is issued for property taken at an overvaluation, which will justify the courts in compelling the stockholders to respond to the creditors for the par value of the stock less the

actual value of the property taken in exchange for it. Such will not be the case where there is entire good faith in making the valuation. But, if the property contributed is not valued in good faith, the shares of stock will not be fully paid up, either in law or fact, by the contribution of such property," and cites with approval the case of *Wetherbee v. Baker*, 35 N. J. Eq. 501, where it is declared that: "The courts have inflexibly enforced the rule 'that payment of stock subscriptions is good as against creditors, only where payment has been made in money or what may be fairly considered money's worth.'" In the same case (Coleman case) there was also a transfer of patents, and a prospect of future profits from the business. In that case it is further declared that: "A purchaser or assignee of stock, which has not been fully paid, does not become liable to the corporate creditors for the unpaid balance, where the stock has been issued as fully paid, and he has acquired the same in good faith and without notice that it has not been fully paid."

The Coleman case, 154 Illinois, and the Sprague case, 172 Illinois, both hold that good faith is a necessary element in any transaction where property is taken in payment of subscriptions to a corporation. Both cases sustain the position that where there is an overvaluation, combined with a failure to exercise any judgment as to the value of the property taken, or where there is an intentional overvaluation of the property or where the circumstances show that the transaction as to the exchange of the property for the shares of stock, was a mere fraudulent device; that it must be held there was an entire absence of good faith and that the transaction will be held fraudulent in law and in fact. Also, "That any one purchasing stock issued as 'paid up' with notice that it is not paid up stock or with notice of facts connected therewith, his liability is the same as that of the party who transferred the stock to him."

It is insisted by some of the signers of the subscription agreement that they did not attend any of Mackaye's exhibitions and hear his lectures there or at the Union League dinner; and, therefore, they are not chargeable with the same

knowledge as others who did. They claim they had a right to presume that the stock referred to was full paid stock which the corporation had once issued and subsequently had acquired the ownership of, and therefore they were innocent purchasers without notice and for value.

Those who signed the subscription agreement to take the bonds of the Celebration Company, do not stand in the position of purchasers for value in the open market. That is, they do not stand in the same position as one would who would buy fully paid and non-assessable stock upon the stock exchange. They were dealing directly with the Celebration Company, and in signing the agreement were making a special agreement with that corporation.

What, if any, is the presumption as to the stock referred to in the agreement? The presumption is that the stock referred to in the subscription agreement was stock that had been issued as full paid stock, and had subsequently been legally acquired by the corporation, or that the stock of the corporation was to be issued on payment for the bonds as full paid and non-assessable, without the corporation receiving any consideration therefor.

It is argued that it is no unusual occurrence for a corporation to acquire its own stock and afterwards sell it for what it can get. If a proposal like this had been made, by an old established corporation, in active business for years, and with so large a capital stock that $800,000 of it would be a very small proportion thereof there might be some ground for the contention of defendants, but that was not this case.

The subscribers are presumed to have known the amount of the capital stock of the Celebration Company, the purpose, and all that is set forth in its charter, as well as the law of the land governing such corporations. Its name, without reference to its charter, indicated that it was intended to be used in connection with the World's Fair of 1893. A person does not buy bonds as he would a basket of eggs. Investors are not supposed to deal with a corporation for its bonds or stock with their eyes shut. The subscribers to the agreement were also chargeable with notice of the contents of the first mort-

gage securing the bonds, as the subscription agreement itself recites that the bonds were to be first mortgage bonds, and to be made preferred in payment. First mortgage upon what?

The mortgage deed itself (with contents of which they are chargeable) informed them that the trustee in the mortgage trust deed made to secure the bonds, was the American Trust and Savings Bank, and that the mortgage itself (excepting the right to use Mackaye's inventions) described no specific property, but was of all the property, assets, franchises, etc., of the corporation then owned by it, or to be further acquired.

This right to use the inventions is stated in the trust deed to have been secured by a certain contract recorded in the patent office at Washington. This recital charged the subscribers for bonds with notice of the contents of said contract, which contract showed on its face that it was made before any application for the patents for said inventions were filed.

This, with other circumstances referred to, were sufficient to put a reasonably prudent and cautious man upon inquiry as to the good faith of the transaction recited in said contract or agreement, and were sufficient of themselves to put such subscribers, persons receiving the bonds, upon inquiry as to what property the company owned, what was its value, as to whether its capital stock was paid up, and if so, how; also as to the value of the right to use the patents and the good faith of such alleged sale of the inventions to the corporation. As this company was but sixty days old and the money to be raised by the bonds was intended to start it in business, the matters heretofore recited were sufficient to put the subscribers upon inquiry as to how the corporation obtained or could expect to obtain $800,000 of its full paid stock, to carry out the subscription agreement.

This inquiry, upon which the subscriber was put by reason of the facts recited in the opinion of the court, would necessarily have led the subscriber to the knowledge that the stock that was deposited, or to be deposited, with the American Trust and Savings Bank, was part of the stock which had

been illegally and fraudulently issued by the corporation to Mackaye in pretended payment of his subscription, and, that the same had been returned to the corporation without cost, to be used as a bonus for the bonds, and had never been paid for by any person.

The fact that a corporation not sixty days old, never having done any business, with capital stock subscription of $2,000,-000, purposes to put on sale $800,000 first mortgage bonds with which the purchaser of the bonds was to get an amount of full paid stock equivalent to the bonds purchased, was of itself, in the opinion of the court, sufficient to put any reasonably cautious and prudent investor upon inquiry as to whether it was full paid stock.

As to defendants whose original signature to the subscription agreement is not produced in evidence; it appears that a number of the copies of the subscription agreement which was signed so largely at the Union League Club dinner, were circulated for signatures. All of them have not been produced in evidence, although the names of parties who, it is alleged, signed the missing copies, appear on the books or papers of the Celebration Company as subscribers for bonds. There is other evidence also as to who became subscribers for bonds, other than the subscription papers themselves.

It appears by the record of proceedings of the Celebration Company, that on the 23rd of May, 1892, the increase in the number of directors was approved, and that a meeting to elect the additional directors was held on August 17 at which E. B. Butler, E. W. Gillette, F. H. Head, J. Foster Rhodes, H. E. Weaver and Murray Nelson, defendants in this case, were elected such six new directors.

On the 25th of August following, the executive committee of the directors reported to the board that the subscription for bonds had reached $500,000, and the secretary was ordered to issue a call for the ten per cent. thereof to be paid September 5, 1892.

September 9, 1892, the directors of the Celebration Company adopted a resolution directing the American Trust and Savings Bank, as to what course it was to pursue in the delivery

of bonds and stocks deposited with that company as trustee, and the resolution sets out the subscription agreement in *haec verba* and directs the bank that whenever a subscriber presents a certificate of the secretary of the Celebration Company, that he has paid to the treasurer of the Celebration Company the full amount of his subscription, the trustee should deliver to such subscriber the number of shares subscribed for by him and in addition thereto, shares of the Celebration Company's stock equal to the amount of said bonds and take his receipt therefor, and report to the Celebration Company the names of subscribers to whom bonds were delivered, the date of delivery, the number of the bonds, and the accrued interest endorsed thereon.

The methods pursued by the American Trust and Savings Bank and the Celebration Company, in connection with said bonds and stock, necessarily resulted in the books of the two companies showing who paid for the bonds, and when payment was made; whether the subscribers took bonds only or took bonds and stock; who had been certified by the Celebration Company as having paid his subscription in full, and who had received bonds and who had received stock. The American Trust & Savings Bank was the trustee of the subscribers and acting for them, as well as for the Celebration Company.

It also appears that the subscription agreement provided, in substance, that payment for the bonds should be in not less than five calls, and it appears six calls were made, one each in September, October, November and December of 1892, and January and February, 1893.

The books of the corporation therefore would and do show who responded to these calls and when the same were paid, when bonds were paid in full, and the issue of a certificate to that effect to the bank by the Celebration Company.

While it appears that the Celebration Company from the time the 8,000 shares were returned or donated to it, the corporation treated the same as being its own property, it nowhere appears that it had any other shares of stock than said 8,000 shares.

It also appears that the Celebration Company pledged some of said 8,000 shares of stock (not exceeding in all 200 shares) as collateral security upon some contracts and loans, but there is no finding by the master as to any defendant being liable upon any of the shares so pledged.

There is no evidence in the record that the American Trust and Savings Bank acted as trustee in the sale by the Celebration Company of any of its bonds to any person except under the subscription agreement. It also appears from the evidence that in April, 1893, it having become apparent that unless more money was raised, the projected building for the show could not be completed, the directors of the Celebration Company passed a resolution that the three hundred thousand dollars (the balance of the $800,000) of bonds remaining unsold, should be made preferred in payment, provided four-fifths of the holders of the $500,000 bonds subscribed for should consent thereto, and a consent paper was circulated among the subscribers for the $500,000 of bonds to which a large number of such subscribers signed their consent, but not quite four-fifths in amount.

A subscription agreement to take such preferred bonds was started, and signed by Pullman and others, but signers for only about one-tenth of the amount necessary were obtained.

This last mentioned agreement was to the effect that the subscribers for the preferred bonds were to receive each $2,000 of stock on payment of a thousand dollar bond.

This evidence, together with the evidence contained in the books and papers of the Columbian Celebration Company and the American Trust & Savings Bank, as to the several calls for payment on the bonds, on parties as subscribers to said subscription agreement, and as to who responded to such calls and as to who paid for such bonds, who were certified to as having paid for bonds in full, and also as to who gave receipts for bonds and stock or bonds only, together with evidence in the record from said books and papers, are sufficient proof as to all defendants against whom the master has found as signers of said subscription paper, and whose signatures to such subscription paper were not admitted or not proven

.by reason of the loss of some one of the copies to which the same were affixed.

As to those defendants who held stock not part of the 8,000 shares returned by Mackaye to the Celebration Company; it appears that on May 22nd, 1892, one day after the 19,995 shares appear to have been issued to Mackaye, the stock was held as follows: Edmonds, 1 share; White, 1 share; Mackaye, 7,349 shares, certificate No. 6; Butterworth, 1,574 shares, certificate No. 7; Crosley, 1,575 shares, certificate No. 8, a total of 10,500 shares, leaving 9,499 shares in the treasury unissued, but a part of certificate No. 1 for 19,996 shares originally issued to Mackaye, which certificate No. 1, was left with the secretary with no directions as to whom said balance of 9,499 shares should be issued.

As before stated the shares appear to have been returned to the corporation, to be used for promoting the enterprise, and of this 9,499 shares, there was issued 8,000 shares to the American Trust and Savings Bank, and this was done without any order on the part of Mackaye appearing by the record. These 8,000 shares were deposited, as before stated, by the Celebration Company, with the American Trust and Savings Bank, for the purpose of carrying out the subscription agreement for the bonds. The evidence shows that the American Trust and Savings Bank did not know Steele Mackaye in the transaction as to the 8,000 shares, but dealt solely with the Celebration Company.

The balance of the promotion stock, to-wit, 1,499 shares, passed by certificate in the hands of Crosley as trustee, and he subsequently surrendered the same to the corporation, and ordered 500 shares thereof issued to Butterworth as trustee, and 999 shares to himself as trustee. These issues of the 1,499 shares all appear to have been done without Mackaye having anything to do with the same, and by the company of its own motion.

This leaves the 10,500 shares of stock, which were not used for promotion purposes, to be considered, to-wit: Certificate No. 6 for 7,349 shares to Mackaye; certificate No. 7 for 1,574 shares to Butterworth; certificate No. 8 for 1,575 shares to

Crosley; certificate No. for 1 share to White; certificate No. 1 share to Edmonds, making a total of 10,500 shares.

The parties who became owners of these 7,349 shares issued to Mackaye, appear by the stock book to have been the following: Steele Mackaye, B. Butterworth, F. B. Carpenter, C. R. Gillette, E. W. Gillette, C. Bell Johnson, B. A. Eckhart, E. L. Brewster, C. W. Upton, Henry E. Weaver, Dudley H. Rood, Sarah S. Peavey, Mary M. Mackaye, J. Foster Rhodes, Helen Lane Mackaye, Harold S. Mackaye.

Certificate No. 7, issued to Butterworth, 1,574 shares, of this stock, appears to have been owned subsequently by the following parties: Benjamin Butterworth, Clarence R. Gillette, E. W. Gillette, George C. Gray, J. Foster Rhodes, George M. Drake, Henry E. Weaver, E. B. Butler and H. Knapp.

Of the original certificate No. 8 for 1,575 shares issued to Crosley, 450 shares were assigned to Butterworth as trustee.

Mackaye, Butterworth and Crosley were the original promoters of this scheme for putting this 10,500 and other shares upon the market as full paid shares, when, in fact, nothing had been paid thereon. They are responsible on all of said stock held by them except such as was transferred to them for promotion of the enterprise.

Mackaye and Butterworth have both deceased, and were non-residents of this state. Neither they nor their representatives are brought into court in this case, so that no personal decree can go against them.

Harold S. Mackaye, Helen Lane Mackaye and Mary M. Mackaye paid nothing for the stock assigned to them by their father and are also non-residents of the state, and no personal service has been had upon them.

Henry E. Weaver was very active in promoting the sale of the stock of the Celebration Company, and from the evidence it appears that he must have known that the stock which passed into his hands was unpaid stock. He is liable upon all such stock jointly with those to whom he transferred the same, and individually liable upon all stock held by him which was unassigned. It appears from the evidence that he has

made an assignment for the benefit of his creditors, and the presumption is that nothing can be collected from him.

As to E. W. Gillette and C. R. Gillette and J. Foster Rhodes, I have carefully read all the evidence touching their connection with this stock. It is shown that they were all three very early in the enterprise interested in promoting the same. In fact, they were so active before the corporation was chartered, and no candid reader of the testimony can doubt for one moment that each of them knew that the stock had not been paid for, and that the issuing of the same as full paid stock was in bad faith and a fraud upon those who might become creditors of the corporation. The court has no hesitation in confirming the report of the master as to E. W. Gillette, C. R. Gillette and J. Foster Rhodes.

The same ruling must be made as to B. A. Eckhart. The master's report as to his liability must be confirmed; also as to his being jointly liable for the stock issued in the name of C. Bell Johnson.

E. B. Butler, the evidence shows, did know or should have known, all about the fraudulent issue of the stock, and shows he paid nothing for the 450 shares issued to him, the same being a present to him from Butterworth. He transferred 45 of them to one H. Knapp, who, in his evidence knew that the stock was not paid for by any person. Knapp is a nonresident and no decree can go against him personally. Butler is jointly liable with Knapp on the shares he transferred to the latter.

George M. Drake, assignee of E. W. Gillette, claims to have purchased $15,000 worth of stock for 20 cents on the dollar, giving his note for same, with stock as security. I concur with the master that Drake is liable as assignee, and Gillette as assignor of said stock. If the transaction between the two was not a mere cover for Gillette, Gillette knew and Drake had notice of facts sufficient to put him upon inquiry and could have known the same if he did not, in fact, know the same.

George C. Gray was a clerk for J. Foster Rhodes, and it ap-

pears from the evidence he paid Rhodes nothing for the stock and took the same for Rhodes, who is the real owner thereof. They are jointly liable on the 120 shares of stock transferred to Gray.

As to all said named parties (except Carpenter, Upton, Reed, Peavey and Brewster) who held shares of stock embraced in certificates Nos. 6, 7 and 8, and which were not a part of said 8,000 shares returned by Mackaye to the corporation, it is unnecessary to discuss further in detail the evidence bearing upon their liability on stock held by them respectively, either as assignees or assignors.

I have studied the evidence carefully as to each defendant, and am satisfied that it is sufficient to show that they (respectively) either had actual notice that the stock acquired by them respectively, was unpaid stock, or that the circumstances under which they respectively acquired the same, were sufficient to put them upon inquiry which would have led to such knowledge, and that the master did not err in finding them liable for stock as he in his report herein has found.

Several certificates appear to have been issued to F. B. Carpenter upon the order of Steele Mackaye, and receipted for by Mackaye. Upon the back of one certificate appears an order from Carpenter to the secretary of the Celebration Company, to deliver all certificates standing in his name to Steele Mackaye. It appears from the evidence that the Celebration Company received no consideration for the certificates issued in Carpenter's name and that he was transferee of Steele Mackaye, which stock was not paid for.

The complainant, having shown that the original stock, of which that issued to Carpenter was a part, was unpaid stock, and that nothing was paid upon the stock at the time it was issued to Carpenter, it put the burden of proof upon Carpenter to show that he was a purchaser for value without notice. This he failed to do, and must be held liable upon certificates No. 187 for 150 shares, No. 94 for 45 shares and No. 88 for 5 shares, transferred to him by Steele Mackaye.

As to the stock issued in C. W. Upton's name, 40 shares— that to Dudley H. Rood, 5 shares, and to Sarah A. Peavey,

50 shares, the evidence that they ever held the stock is by no means convincing, and if they did, that they knew it was unpaid stock is unsatisfactory, and the finding must be in their favor.

The evidence on the part of complainants tends to show that certificate No. 282 for 100 shares was issued from certificate No. 273. Steele Mackaye owned No. 273 for 100 shares issued the 22d of April, 1892, and it appears, returned it to the company with an assignment on the back directing it to be re-issued to E. L. Brewster. The name of Brewster on the back of the certificate appears to have been written over Steele Mackaye's. On the 28th of April, 1893, certificate No. 282 appears to have been issued to E. L. Brewster, and like erasures and writing of Steele Mackaye's name in place of Brewster's appear as to this certificate. This last certificate appears to have been returned to the secretary of the Celebration Company, and cancelled, upon May 2d, 1893, (as issued by mistake) which was after the failure of the enterprise became known.

Brewster was a broker and was active in inducing others to subscribe for the bonds of the corporation, and clearly, from the evidence, it must be admitted knew or should have known this stock was not paid for. I cannot find any evidence of Brewster or other evidence in the record, denying that Brewster was the owner of this certificate. He was not, so far as I can discover, asked, nor did he testify particularly as to his connection with this certificate. His failure to do so, although he was on the witness stand, must be held insufficient to overcome the evidence tending to show that he owned this certificate. His general denial that he was a stockholder in the corporation is not sufficient.

John J. Mitchell subscribed for $5,000 of bonds at the request of Brewster, paid for the same but never took either bonds or stocks. Under the rulings I have made he is liable as a stockholder unless his plea of the statute of limitations can be held a good defense.

It appears to be admitted that if the statute of limitations had commenced to run when the insolvency of the Celebration

Company occurred and before the commencement of this suit (both of which occurred in the month of May, 1893), that the defense of the statute of limitations is a good one. Mitchell was made defendant when the suit was commenced and a demurrer having been put in to the bill and having been sustained, an appeal was taken to the appellate court, which court reversed the judgment of the lower court and remanded the cause with directions to overrule the demurrer. Mitchell was not notified as required by law of the re-docketing of the case in this, the circuit court, and more than five years elapsed between the time he was again summoned to appear, and the insolvency of the Celebration Company.

The question is, whether the statute commences to run from the insolvency of the corporation, or from the time that a decree should be entered in the cause, declaring what indebtedness of the corporation remains unpaid, what are its assets, who are stockholders and what amounts remain unpaid upon their stock, the deficiency (or approximately) so to pay debts. That whether inasmuch as the issue of the capital stock to Steele Mackaye in payment of his subscription was good as between him and the corporation, that transaction must be set aside before any liability of the stockholders accrues.

It must be admitted that there must be a decree that there is unpaid stock, who are liable for the amount unpaid, and that there must be a deficiency of assets to be paid creditors, and that stockholders can only be held *pro rata* for the amount of such deficiency, if it be less than the total amount unpaid upon the stock. At common law, some of these defendants charged as stockholders, those who had transferred their stock, could not be held liable, but they are made jointly liable with their transferees until the stock is paid.

The jurisdiction of this court in the suit at bar depends entirely upon section 25 of the corporation statute, because it is brought by simple contract creditors. A judgment creditor who has exhausted his remedy at law, has a standing in equity to pursue all the property and choses in action belonging to his debtor which is held by others for him. He may by creditor's bill equitably attach all rights and credits of his debtor and have them applied in satisfaction of his judgment.

A simple contract creditor has no such standing in a court of equity, and only acquires a right to bring a bill of this nature against a stockholder by virtue of section 25 of the incorporation act. Therefore, he is pursuing a remedy created by statute.

The case of the *Great Western Telegraph Company v. Gray*, 122 Ill. 630, is but little in point, as it was under the law as it existed prior to the enactment of the present section 25 referred to. As the law then stood, the stockholders were not necessary parties to a bill.

The decree in the case in the 122 Ill. was, that the receiver proceed to collect the assessment and it was in a suit at law by the receiver against Gray that the statute of limitations was invoked. The court held that as the directors had failed in their duty to make the assessment the court could make it; that no right of action arose until such assessment was ordered made, and therefore the statute of limitations did not commence to run until such decree or order was made by the court.

So far as the complainants' rights as simple contract creditors to commence this suit is concerned, it exists merely by force of the present statute. Their feet stand upon section 25 of the corporation act. Blot out section 25 and their right to be in this court seeking the relief prayed disappears. Section 25 gives them their only right to be here as complainants.

The defendant Mitchell, so far as the plea of the statute of limitations is concerned, was not brought into this case until more than five years after this suit in equity was commenced. The plea admits a right existed to sue defendant, but alleges complainants did not commence this suit against him until more than five years after the time the cause of action, the right to commence this action against him, arose. The cause of action and right to commence suit must co-exist. The appellate court of this district, by Judge Adams, has, since writing the above, made a decision upon this question of the statute of limitations in suits of this nature which is precisely in point. It is the case of *Parmelee v. Price*, 105 Ill. App. 271.

As to estates of deceased stockholders. What is the effect of the two years' statute of limitations for filing claims against the estates of decedents? In all cases where the stockholders

were brought into court and afterwards deceased and the suit was revived by bringing in the executor or administrator at any time within the general statute of limitations, a decree would go against the executor or administrator if he was brought into court within two years time from the date of issue of the letters of administration; that the amount found due from the deceased stockholder should be paid in regular and due course of administration. If the executor or administrator is not brought in either by way of revivor or by original suit, within two years time of the issuing of his letters of administration, the only decree that can be made is that the executor or administrator pay the same out of assets discovered or inventoried, after the expiration of said two years.

The two years limitation is only a limitation upon the right to participate in the assets of the estate which have been inventoried within the two years from the taking out of letters for the administration of the estate.

The case of *Morse et al. v. Pacific Railway Company,* 191 Ill. 356, states the law applicable to this class of cases clearly and fully and should be followed in drawing the decree.

It is contended that The American Trust and Savings Bank should be held liable as trustee holder, for $239,000 of stock, part of the $800,000 deposited with it by the Celebration Company to carry out the subscription agreement referred to.

It must be admitted that the evidence clearly shows that neither The American Trust and Savings Bank or the Celebration Company intended by the transactions between them as to this stock, that the bank should acquire any ownership or interest in or control over the stock deposited with it, other than to hold the same in escrow for the parties that were or should become entitled to it.

A party holding stock in escrow incurs no liability as a stockholder. The action of the bank was not *ultra vires,* but by acting as a mere conduit or stakeholder, to hold in escrow, it incurred no liability because what it held was unpaid stock.

It is contended that the 3,000 shares of stock not required to carry out the subscription agreement, that as to those shares

the bank held the same for the Celebration Company and not for delivery to subscribers for bonds. At the time the 8,000 shares were deposited with the bank it was supposed that the whole might be necessary to be used for carrying out the subscription agreement, and it makes no difference that there was not then any *cestui que use* as to 3,000 of the bonds. It was not known, and could not be known, whether or not all of the 8,000 bonds would or would not be sold and the whole stock issued in connection with such sale. That the Celebration Company became insolvent and the 3,000 shares were not required to aid in the sale of the bonds, cannot make the bank liable, and its position in regard to said shares was the same then as when it received the stock.

It would be manifest injustice to hold the bank liable for the stock in question when it never intended to acquire any interest, right or control of the stock or any part of it as a stockholder.

The finding of the master that The American Trust & Savings Bank never subscribed for or in any way agreed to or did become the owner of any stock of said Columbian Celebration Company; that it had no interest in said 8,000 shares of the stock other than as a conduit through which said Columbian Celebration Company could conveniently separate and transfer the same in accordance with its own plans and arrangements, and that the said bank is not the holder, assignor or transferer of any stock of the Columbian Celebration Company, within the meaning of the twenty-fifth section of chapter 32 of the Revised Statutes and hence is not liable thereon, is in all respects confirmed.

Upon the question whether the claims of the holders or owners of the bonds issued under the subscription agreement, should be allowed, as claims against the insolvent Celebration Company, and if so allowed, can such claims be set off against the liability of the stockholders holding bonds and if not allowed as set-off should such claims be postponed to the claims of other creditors not stockholders, or should they stand upon an equal footing with such other creditors?

I have given this branch of the case that careful examina-

tion which its importance demands. I shall not discuss the authorities cited by the respective counsel. The questions involved are not (except as to the right of set-off), free from difficulty, but upon a careful review of the argument of counsel and the many authorities cited, I have come to the conclusion that the findings of the master in regard to the same are correct.

It is clear upon the authorities that the claims of the bondholders cannot be allowed as a set-off. In order to have a right to the assistance of a court of equity, they must first do equity by paying for the stock issued in connection with such bonds.

As to whether their claims should stand upon an equality with the claims of other creditors, presents a far more difficult question.

If these bondholders had paid for the stock when they took their bonds, there would be no question of their right to participate in the assets of the insolvent Celebration Company. If they now pay for the same, why is not their right of equal participation as great now as it would have been if they had paid for the stock when they received the stock and bonds?

But it is contended that they do not come into equity with clean hands, and the maxim that ''He that doeth iniquity shall not have equity'' is evoked against their right to participate upon an equality with other creditors. This case is peculiar. There were no creditors when these bondholders entered into the subscription agreement, nor when they respectively took their bonds and stock. There was no actual fraud as to these creditors at that time, because they were not then creditors. The fraud that was committed in taking the stock without paying for the same was a fraud upon the law, although a valid transaction as between the bondholder and the Celebration Company. The creditors were not parties to the transaction and the fact that the law gave the subsequent creditors a right to pursue the holders of the stock, and compel them to pay for the same, cannot in my opinion, be held to be such ''iniquity'' as would justify the court in declaring that they should not as creditors stand on an equality with other subsequent creditors of the corporation.

The corporation had the money of these bondholders and also received the consideration that other creditors gave them for the debts owing them. Why should not these two classes of creditors stand, as to the assets of the corporation upon the same footing as they would have stood had the bondholders paid for their stock when they received it? Whatever fraud there was upon the law in taking stock without paying for the same, they have made good the wrong done when they now pay for the stock.

The principle that equality is equity or as Story has it "equity delighteth in equality" underlies the whole doctrine of equity as administered in the settlement of insolvent estates, and the marshaling of assets, and is of very wide range. In my opinion, as between such bondholders and their creditors, there is no estoppel and the principle of the maxim that "He who seeks equity must come into equity with clean hands" cannot be invoked to prevent the application of what might be termed the universal rule of equity in the settlement of insolvent estates, that all creditors shall share equally in the assets. As the bondholders are to share with other creditors in the assets it is evident that full payment of the stock will be required.

It is true that admitting the bondholders to share in the assets will, in this case, leave the other creditors with a portion of their debts unpaid, but such might have been the result if the bondholders had paid for their stock in the beginning. They are all creditors as between them and the corporation by valid and binding contracts and stand upon an equality as to their rights to share in the insolvent's assets.

So far as the rights of bondholders to share equally in the assets of the corporation, the bonds and stock taken with the bonds are inseparably connected in their equities in this case. The bonds, or payments on account of bonds, of Mitchell or others who escaped paying for the stock allotted with such bonds, should not be allowed to share on an equality with other creditors.

The master is confirmed in his findings that no bond creditor should be allowed to share equally in the assets with other creditors, until the stock given with such bonds shall be first

paid. Such payment should be a condition precedent to the right to invoke the maxim that "Equality is equity," because, "He who seeks equity must first do equity."

In conclusion it is sufficient to say that the master's finding in regard to the rights of the holders of bonds to prove the same and share equally in the assets, is confirmed in all respects. It will be seen that the result is that the court confirms the master's finding as to the liability and joint liability of all defendants whom he finds became holders of the stock of the Celebration Company, issued in connection with the subscription agreement.

Also the master is confirmed in his holding as to the individual and joint liability of all other defendants who became holders of the Celebration Company's stock, other than the 8,000 shares of stock deposited with the American Trust and Savings Bank, except as to the defendants Upton, Rood, and Peavey. As to the estates of decedents the rule laid down in the 191st Ill. 356, is to be followed.

The decree in this case should be prepared with the assistance of a master and there should be a reference to the master to ascertain and report the liability of each defendant, individual and joint for the purposes of such decree, and that he report a decree in pursuance of the findings of this opinion, with leave to the master or any party in interest, if necessary, to have further directions.

### NOTE.

A decree was thereafter entered in accordance with the opinion of Judge Tuley and an appeal was taken to the appellate court where the cause is still pending. The opinion of Judge Tuley is so thorough that the editors have deemed it advisable to publish the same.

For opinion of the appellate court on a former appeal see 55 Ill. App. 381.

---

Since the above decision has been put in proof the appellate court on January 7, 1907, affirmed the decision of Judge Tuley and adopted his opinion as the opinion of the appellate court.